Oral Argument is not to exceed 15 minutes per side, Ryan you may proceed for the appellant. Good morning your honors and may it please the court. Russ Ryan with the New Civil Liberties Alliance on behalf of Appellant Mackinac Ctr for Public Policy. And may I please reserve three minutes of my time for rebuttal.  Thank you. Three weeks ago in Boston against Illinois Board of Elections, Chief Justice Roberts reiterated the Supreme Court's admonition that courts sometimes make standing law more complicated than it needs to be. We respectfully submit that the Department of Education and Judge Ludington have done exactly that in this case. Mackinac has standing because in 2007 a bipartisan majority of Congress gave Mackinac a valuable wage subsidy or a bargaining chip which it uses to recruit and retain college educated talent to staff its operations. Yet from 2020. I mean I guess the question here is we have a published decision on the books. Judge Mathis wrote it. How is this case different from that one? It was well it was first a different program that the department. I understand that. But I mean in terms of the same theory which is it makes it more difficult for us to recruit and retain talent because of the way they've kind of manipulated the public service program. Isn't it essentially the same? I understand it's a different incentive. It's a different program. But isn't it the same theory? This kind of it makes it makes it harder for us to compete in this labor market. Right. I think the key difference is in that case it dealt with the time it with with timing. It was forbearance. It was the timing of when payment and interest would be paid. But the program did not reduce outstanding student loan balances. Mackinac's wage subsidy is more valuable the more student loan debt is out there. But it's reduced when student loan debt is eliminated or forgiven. That case involved forbearance. It's not intuitive to me though. I mean if wouldn't in the ideal world nobody would have any student debt and you would be able to recruit anybody. Right. I take it that you're saying hey we it's harder for us to compete because it's harder for people to repay their student loans if they go into public service. If public if debt is simply eliminated doesn't that make it easier then to go into public service? That's not the judgment Congress made in 2007. Congress made the judgment that because student loan was getting out of hand. So student loan debt and because it was difficult to entice people to take public service jobs that that was the engine they would use to drive student loan debtors into public service work. That's the notion that. I guess one thing I don't understand is how is this a wage subsidy for nonprofits. I see how it's a wage subsidy for student loan borrowers. But I fail to see how what Congress did in 2007 with this program created a wage subsidy for entities like your client. It's because in the competitive market to hire college educated talent, every dollar of student debt that a college graduate owes translates into a wage subsidy to a nonprofit if they go and work there. Because the only way they get that forgiveness at the end of the 10 year period is if they work for a nonprofit organization. So it's two sides of the same coin. If Congress just wanted to get forgiveness. On the front end are you all asking if the college graduates have student loan debt? Is that something that you're asking? Meaning your client. I'm sorry. Are your clients asking on the front end if the people they're hiring have student loan debt? I think that's typical. I don't think they ask at the front end, but they certainly do weigh that as an enticement to come work with us in the nonprofit sector. That was the whole purpose behind the PSLF. Do they pay different amounts based on whether someone has student loan debt or doesn't have student loan debt? I think an economist would tell you yes. Let me ask you about your client, Mackinac. I don't think that's in the record, but as a matter of just basic economics, if I know that part of the compensation package is this forgiveness at the end of 10 years, as a matter of economics, I need to offer them slightly less money to entice them to come because at the end of the 10-year period, they get this enormous sum of money forgiven from their student loan account. To me, that's just basic. Do you have anything in the record of losing applicants to other jobs, or that specifically people would inquire, if this program goes away, am I worse off? Remember, we're at the motion to dismiss stage now. We're not at summary judgment. But then on general principles, what you've got is the government. I mean, I'll buy your economic argument in theory for the moment, but that rests on the government gives by law something that gives somebody in the economy some kind of a penny, and then they take it away. Can everybody sue? I mean, by example, they have subsidizing lithium mines, let's say, and I have a non-lithium mine, so I'm at a disadvantage. And then they take away the subsidy. I mean, does every subsidy create a standing to complain about what the government does? It does if you're the recipient of the subsidy, especially one that's bestowed by Congress, and then an unelected administrator takes it away. We know that from the Clinton against New York case that we cited throughout our brief. But that's the key, right? You just said it. If you're the one that receives the subsidy, the borrowers are the ones who receive the subsidy here, not you, not anybody. You're not directly receiving the subsidy, right? The court has said in Clinton against New York, I think in Diamond Alternative Energy last year, that there can be more than one person who benefits from a subsidy. And in this case, we think if you look at the legislative history, if you look at the- Well, in theory, all of society benefits from the subsidy. I mean, Congress is doing it for, as you said, some general benefit. We want people generally to work in public service. We know that's not enough for standing, but- We do know that. That's why I'm asking. Nonprofit organizations were intended beneficiaries of the PSLF. They're not just mere bystanders here. They're part of the system, and they're part of the engine that drives the system, because that's what Congress decided to do in 2007. What is the relief that you want at this point? We want a declaration that what the department did here, the eight times it extended the payment and interest pause without statutory authority, was unlawful, to declare it unlawful, and to set it aside, essentially, and enjoin the department- So borrowers have to pay back money? What's the concept? They might. Yeah, they might. The court's role-well, right now we're only talking about standing at the moment. Oh, my Lord, how is somebody even going to order that relief? I mean, do they need to be brought into this lawsuit, like a class of every borrower who ever benefited from this subsidy, because they might be negatively affected by the outcome of the litigation? I think all the district court needs to do is, under the APA, set aside what the department did, and it's up to the department to figure out how to unwind these things, and it might involve going to Congress and getting it done legitimately through a statute to make people- to ease the burden on whoever might be adversely affected by unwinding the extensions that the administration did. So, we also- Let me clarify, by the way, Judge Boggs' question about whether there was anything in the record about your organization's kind of firsthand experience with an employee or somebody that's been affected, or that you were negatively affected. I understand this motion to dismiss H, but there's nothing- I didn't say anything in the complaint, either. Is that right? Well, in the complaint and in the attached declaration, we did say that we do- that McAdoo did have, I think it was, four employees that were in the public loan- public service loan forgiveness program at the time, and that it regularly goes out and expects to hire college graduates. Right, but did those four say, hey, I just got this free money, I'm going to take a bite? That's not in the record, but, again, I would say that the recent Supreme Court cases, plus the Clinton case, which is an older one, but Diamond Alternative Energy, and even the recent Bost case, basically say that you don't have to come in with- especially at the motion to dismiss stage, you don't have to come in and cite and have either expert or fact witnesses testifying to actual damages that have already occurred, whether it's an election in the Bost case, whether it's customers in the Clinton case, or sellers of food processors, or in this case, lost employees or recruits that declined job offers. Even if that's a possible thing to do, it's not necessary at the motion to dismiss stage. So, but the record does not have that. But going back to the earlier case against Mr. Cardona, the real key difference is that that case did not involve the cancellation of debt, and this one does. And so cancellation of debt reduces the value of McAdoo's subsidy in a way that the Cardona case did not. And we think that's a material difference, and the reason why in this case should be governed by the principles in Clinton against New York, Diamond Alternative Energy, and even the Bost case from last month. Are you not relying on competitor standing at this point? On the what? On competitor standing, you're not relying on that. That is sort of a downstream effect of the reduction of the subsidy, but in our briefs I think we were pretty clear that in this case, and I'll also say that the briefing in the district court was done before the Cardona case came down. So in this case, we focused primarily on the more straightforward injury, which is Congress gave McAdoo a subsidy. The department didn't take it away but reduced the value of that subsidy. And I think under Clinton, for sure, Clinton against New York, that's certainly sufficient to constitute an injury for purposes of standing. And, again, this is at the motion to dismiss stage. It's not on summary judgment or after a trial is completed. I see my time is up. Okay, thank you. We'll hear from you in rebuttal. We'll hear from the department. May it please the Court, Sarah Smith on behalf of the government. Two years ago, this court rejected plaintiff's argument, the departmental actions that benefit student loan borrowers with whom plaintiff does not compete, inflict a competitive injury on public service employers like plaintiff by reducing borrower's incentives to participate in the public service loan forgiveness program. That decision was correct, and it applies with full force here. The pandemic era pause in interest accrual benefited student loan borrowers, not plaintiff's competitors. And plaintiff can only speculate as to how those borrowers will respond to the pause in interest accrual vis-à-vis their employment. Plaintiffs, therefore, lack standing, and the judgment below should be affirmed. How do you sort of respond to McAnull's argument that this case is different because it involves cancellation of debt, whereas the Cardona case did not? So what this court said in Cardona is that, and it is true here, that what plaintiffs challenge is a benefit to third-party borrowers. And in that circumstance, the court can infer by just core economic postulates that it's going to create a competitive harm in the market. And so plaintiff needs to plead more. And they hadn't done so in Cardona. They haven't done so here. So it's really on all fours. I mean, my friend is correct that the underlying action is different. But I think if anything, plaintiff had a better case in Cardona. Their issue was an account adjustment that counted excessive periods of forbearance as qualifying monthly payments towards the borrowers, towards the 120 payments that they had to make in order to get public service loan forgiveness. But for that account adjustment, an affected borrower that was in the public service loan program would have had to work longer in public service to get forgiveness. And as we explained in our brief, the real benefit that this program offers employers is that it encourages and incentivizes borrowers to work for 10 years in public service. And nothing about the action here diminishes that service requirement. What's your response to the direct injury argument that they're making now, relying on Clinton and those lines of cases? Why doesn't that apply? So an issue on Clinton was an amendment to the tax code that would have allowed the owners of processing facilities that sold to farmers cooperatives like plaintiffs to defer the recognition of capital gains when they sold to the farmers cooperative. And the sellers could get that tax advantage when they sold to the plaintiff's competitors, but not when they sold to the plaintiff. So it's sort of complicated, but really at issue was that the government was subsidizing the plaintiff's competitors and not the plaintiff. And so to compete in the sale of these processing facilities, the plaintiff would have to offer a higher purchase price in order to compete. This case is not like that. This is not a case where the government is providing a benefit to a private employer that it's not offering to public service employers. Again, this benefit goes to third parties, the borrowers. I understand the formal distinction, but how is it different if you take away a benefit that I'm getting as opposed to giving a benefit to my competitor? It would seem that the dollars and cents value would be exactly the same at the margin. I agree that it doesn't matter whether you're taking away a benefit from the plaintiff or giving it to the competitor. Really the issue here is that what the government did did not take away any benefit to the plaintiff. So if I can just try to, as succinctly as I can, explain why this is not a wage subsidy in the way the plaintiff thinks it is. Plaintiff's theory is that the amount of forgivable debt after 10 years is effectively compensation for working in public service. And if that is reduced by any amount, then dollar for dollar, plaintiff has to pay more to its employees to keep them or its prospective employees. Well, it might not be dollar for dollar. If you get an economist, he'd say, well, there's the time value of money. Maybe. I think they say dollar for dollar. It's something. Right. And so what plaintiffs say is that the interest of the borrowers and the interest of the employers are at odds. But what Congress, that's wrong. Because what Congress said when it created this program was that it was concerned that people were not entering public service employment because of the high cost of student debt. And the intuition behind the program is that if you reduce the student debt, you reduce an obstacle to public service employment. And so really the interest of the borrowers and the employers are aligned because with less debt, it's more affordable to work in public service. So that's one reason why they're wrong. The other one is that they say that this is just like any other subsidy in the market. And that's not true. So if you think, for example, of a subsidy to purchase an electric vehicle, the government might offer a $5,000 tax credit if you purchase one. That effectively lowers the cost of the vehicle. For the consumer, that means $5,000 in your pocket you didn't have before. Borrowers in the public service loan program are almost always going to be on an income-based payment plan where their payments are paid to their income, not to their loan balance. And at the end of 10 years, it's all wiped. So it doesn't matter to that borrower whether the interest is just never charged or whether it's forgiven at the end because they still get the benefit of the program, which is after 10 years, they're debt-free. And so plaintiffs are just wrong basically when they argue that the government has given them a benefit and then is taking it away any time it reduces the burden that students have. If the court has no further questions, we're happy to rest on our brief and ask that the court affirm. I'm just wondering about, I'll go back to the Clinton case because it's a little bit complicated, so maybe I didn't follow it, but the cooperative there, I don't think was the direct beneficiary, was it? I mean, there was kind of a knock-on effect. And that just seems like in this case, there's the same. I know it's the direct theory, but it's also kind of a knock-on effect of a direct theory. And I guess I'm just, that's the one case that gives me some pause, I suppose. Yeah, so I think the, I agree with Your Honor that it was the seller that got to benefit from the tax advantage. But what that meant for the plaintiff was that dollar for dollar, they had to offer a higher purchase price because if the seller sold to the plaintiff's competitor, they could get this tax advantage. And so the sort of absolute price being offered to the seller, even at the same purchase point, was lower effectively when the plaintiffs were the purchaser. And for the reasons that I've just explained, that is not the case in this student loan system where the debt is going to be forgiven at the very end. But do you agree, I guess, with the general statement that public interest employers are intended beneficiaries of the program? Not the only beneficiary, and maybe not even the primary beneficiary, but they are intended beneficiaries. Do we agree about that? I think they are, I might call them incidental beneficiaries. I mean, I think it's true that what Congress wanted to do was, you know, for people who wanted to work in public service to make that possible for them. And, of course, both the employees and the employers are benefits of that, beneficiaries of that. Well, I mean, I guess when I take that and Clinton, it starts to look pretty close. But the difference here is that that decrease in, you know, what they call the decrease in the subsidy, the decrease in the student loan, is not taking away any benefit to the employer. Because, one, they still get the 10-year service requirement. And, two, it's not as though the borrower gets that money in their pocket, you know, would have gotten that money in their pocket at the end. They don't. They're in the same place either way, which is that at the end of 10 years, they're debt-free, and that's what they care about. And I think it's also really important to keep in mind the specific action that's being challenged here. So the overall benefit, which is if I work for 10 years in public service, whatever debt is left over gets wiped out. You're saying that's the core of the benefit, and it's essentially unchanged by the program. That's right. And the action here that's being challenged is a pause in interest accrual for three years. And so, you know, if the borrower, say, has $50,000 in debt and it's 5%, that's $7,500. It's not nothing, but a borrower still has really strong incentive to stay in the program and get their entire balance wiped. But on the other hand, if they don't stay in the program, then the amount of debt they would have would be different. Yes, they would be responsible for paying that entire balance themselves. So they have a really strong incentive. When you said that almost everybody's on an income-based program, if they weren't, would that mean that their monthly payments would be more when this is taken away? If you're the sort of person that just happens to pay their bills when due. Yes. So the statute creating the public service loan program is reproduced at the end of the government's brief, and there it lists the qualifying plans that the person could be on. And they are either these income-driven payment plans, or they're the standard payment plan, where the borrower pays off the entire balance in 10 years. So that is based on the loan amount. But there's really no reason why a borrower would want to be on that plan, because they would have paid it off by the end. There are no further questions. Thank you. Thank you.  Briefly. The department's own regulations acknowledge that this program benefits public service employers. And, in fact, just a few months ago, the department issued a new rule by which they are going to take away the subsidy from certain nonprofit employers that they deem to be engaged in illegal activities. Throughout the Fed Register notice on that, and I can cite it to you at 90 Fed Register 48966, at least a half a dozen times in that Fed Register notice, the department acknowledges that the PSLF gives a subsidy to public service employers. It refers to the employing organizations numerous times as the beneficiary of the public service loan forgiveness program. Council for the Government mentioned subsidies for electric vehicles. And that, too, we do have some recent news about that, which is the one big beautiful bill eliminated that $7,500 rebate that the government would pay to people to incent them to buy electric vehicles. And as soon as that happened on October 1st, fourth quarter sales of electric vehicles plummeted, and most of the manufacturers announced losses for the quarter. So we know that the diminution or elimination of a subsidy inflicts harm on the market participants who benefit from it. In that case, the subsidy was directed to consumers who buy electric vehicles, not the electric vehicle manufacturers, but the manufacturers were the ones that were injured. The same is true in the Supreme Court case we've been mentioning this morning, in Clinton, in Diamond Alternative Energy, in Bost. The government action was not directed at the plaintiffs. In each of those cases, it was directed at somebody else, and the plaintiff was the one that suffered from it because of the predictable economic choices, or in the Bost case, electoral choices of the people that the government action was directed specifically to. Council, this may be off point, but it has occurred to me, as a generality, your organization, to what I can read about it, tends to be on the smaller government, less subsidy side of things. Is your interest as an employer and your interest as an intellectual organization at odds here in any way? No, I think our organization is a nonprofit. We do hire people. We do hire people that are in the public service loan forgiveness program. We're essentially similar situated to Mackinac, if that answers the question. Thank you. I see my time is up. Thank you, Council. The case will be submitted.